IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

QUENTRELL WILLIAMS,

                              Plaintiff,                    OPINION AND ORDER

v.
                                                           18-cv-730-wmc
M. HAURE, KEVIN BRUNING,
P. SHELLENBERGER, B. DOLNICK,
ANGELA BOCK, KRISTI ANSTETH,
and KAITLYN JORGENSON,[1]

                              Defendants.

*Pro se* plaintiff Quentrell Williams, a former inmate at the Dane County Jail, is proceeding in this lawsuit on claims under the Fourteenth Amendment after being forced into a restraint chair because he cut himself with a piece of metal. Specifically, the court granted Williams leave to proceed against defendant M. Haure on an excessive-force claim, based on his allegation that Haure unnecessarily and painfully "tightened" him into the chair. The court further granted Williams leave to proceed on a claim against defendants Kevin Bruning, Benjamin Dolnick, Kristi Ansteth, Angela Bock, Patrick Shellenberger, and Nurse Kaitlyn Jorgensen for failing to intervene to prevent Haure from using excessive force against Williams. Defendants Haure, Bruning, Dolnick, Ansteth, Bock and Shellenberger are represented together and will be referred to as the "County Defendants"; defendant Jorgensen is represented separately.

---

[1] Williams named Kaitlyn Jacobs as a defendant, and she has clarified that her current last name is Jorgenson. (*See* dkt. 117.) The case caption has been updated to reflect defendant Kaitlyn Jorgenson's current name.

1

The County Defendants and Jorgensen have separately filed motions for summary judgment based on the evidence of record, which includes the actual video footage that captured Haure's tightening of the straps on Williams, as well as defendants' other, related efforts to secure Williams.   (Dkt. ##89, 126.)   That footage removes virtually any reasonable dispute as to the degree of force Haure used in tightening the strap on plaintiff and holding him down while he was being restrained.   Considering that footage, as well as all the defendants' undisputed knowledge of Williams' history of manipulation and acts of self-harm within the jail, a reasonable jury could only find that defendant Haure's actions were objectively reasonable.   As a consequence, not only is Haure entitled to summary judgment, but so are the remaining defendants on plaintiff's failure-to-intervene claims. Accordingly, the court will grant both motions for summary judgment and direct entry of final judgment in their favor.

## UNDISPUTED FACTS[2]

### A.     Parties

On July 24, 2018, plaintiff Quentrell Williams was being held at the Dane County

---

[2] Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of facts and the evidence of record cited below, while viewing that evidence in a light most favorable to plaintiff as the non-moving party.  Even so, Williams' responses to the County Defendants' proposed findings of fact are problematic.   In particular, although Williams cites to his declaration as evidence, Williams has not actually filed a declaration in response to their motion, and instead appears to rely solely on his responses to the County Defendants' proposed findings of fact, which have not been signed under penalty of perjury. (*See* dkt. ##115, 116.)  As such, defendants understandably ask that the court deem their proposed findings of fact undisputed.   However, the court notes that Williams has filed a declaration in response to defendant Jorgensen's motion for summary judgment (dkt. #154), and some of those averments are responsive to the County Defendants' proposed findings of fact.  Certainly, the court is not required to scour the record in order to resolve the parties' motions for summary judgment, but given Williams' *pro se* status and the fact that Williams' declaration is before the court for

Jail, where all defendants were also then employed.  Defendants Michael Haure, Kevin Bruning, Benjamin Dolnick, Kristi Ansteth, Angela Bock and Patrick Shellenberger were working as officers at jail, and defendant Kaitlyn Jorgensen was working as a nurse.

**B.     Williams' history of self-harm and disruption at the jail[3]**

Even before July 24, 2018, each of the defendants was aware that Williams had a history of being manipulative, argumentative and dangerous to others at the Dane County Jail.  Each of the defendants was also aware that Williams had previously concealed items (razor blades, metal objects and medications), and that he used those items to harm himself or attempt suicide.

Defendants detail examples of such behaviors, all of which are also documented in Williams' medical records.  Although defendants do not each specifically attest to the extent of their knowledge of each of the following, specific instances of self-harm, the court recites them, since as a whole these instances lend substantial credence to the defendants attesting to a generalized awareness of plaintiff's history of self-harm and disruptive behavior.  *First*, following Williams' April 5, 2017, medical intake, a nurse noted Williams was "very manipulative and has significant [history of] violence."  (Reginato Aff., Ex. 1 (dkt. #19-1) 1.)[4]  She further noted that Williams was angry that he was unable to keep

purposes of Jorgensen's motion, the court will incorporate Williams' averments, at least insofar as his assertions relate to information reasonably appearing within his personal knowledge.

[3] This court must consider all the information about Williams known to defendants at the time of the altercation.  *See Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018).

[4] Williams objects to many proposed findings of fact related to his medical records, citing Federal

his inhaler with him, and he "was not afraid to fight other inmates in order to get medical attention/inhaler." (*Id.*)  Additionally, following an April 6, 2017, sick call, Williams was noted to be demanding medication and told a nurse that he would "get violent with other[s]" and "self mutilates." (*Id.* at 2.)  That same record included another note about Williams yelling at the nurse and repeating that he could "be dangerous to himself and others." (*Id.*)

*Second*, June 16, 2017, notes of an interaction with a mental health professional indicate that Williams harmed himself with a razor.  (*Id.* at 4.)[5]  According to those medical notes, Williams was sent to the hospital, where it was observed that he had lost a significant amount of blood.  The notes related to Williams' subsequent suicide watch further indicate that he had obtained a razor, broke it, and cut his left forearm, which required 10 to 12 stitches.  The following day, June 17, 2017, the notes state that deputies were called to Williams' cell because he had "concealed another razor . . . and began cutting his right forearm." (*Id.* at 5.)  Williams had apparently reported feeling depressed and expressed

---

Rules of Evidence 701(c), 802, and on the ground that they have not been authenticated.  However, defendant Jorgensen has attested to the authenticity of these records.  Given that Jorgensen was a Health Services Unit nurse at the jail, Williams' objection is overruled.  Further, to the extent Williams is raising a hearsay objection, the defendants cite to Williams medical records *not* for the truth of the matters asserted, but to demonstrate how that information, true or false, necessarily *informed* their handling of Williams.  To the extent made for purposes of medical diagnosis or treatment *and* describing medical history, symptoms, their inception or causation, the statements are exempted from the hearsay exclusion under Fed. R. Evid 803(4).  Finally, Williams has submitted *no* evidence that would create a genuine dispute with respect to defendants' sworn statements regarding their awareness of Williams' history of self-harm, manipulation, and posing a danger to others.

[5] Williams' June 16, 2017, records also show that he engaged in a hunger strike and refused three consecutive meals.  (*Id.* at 7.)

4

frustration that since arriving at the jail in April, he had no access to medications he had been taking. The notes also indicate that Williams was returned to the hospital for stiches, for which he returned to the jail with a prescription for certain unidentified medications. (*Id.*) On June 19, Williams' records show that he removed his stitches from his forearm and repeatedly stated that he wanted to be left alone to die. (*Id.* at 8.)

*Third*, following a July 15, 2018, interaction with a nurse, she noted that Williams' actions were "aggressive and argumentative [towards Jail staff,] stating '[y]ou better get me out of here before I catch a case with these assholes.'" (*Id.* at 7.)

*Fourth*, on July 21, just a few days before the events giving rise to this lawsuit, a medical note describes Williams having put a "sheet around his neck and tied it to the bars," to which multiple deputies and a nurse responded. After finding Williams standing in his cell, he was then moved to another cell and placed in a safety smock without further interventions needed. (*Id.* at 10.) However, Williams was placed on suicide watch that same day, and the medical assessment in support noted that Williams reported his depression was worsening, his medication (150 mg of bupropion) was not working, and he would kill himself at the first opportunity. Williams also confirmed suicidal ideation with intent, although he offered no current plan or means to carry it out.

## C.  Events surrounding Williams' July 24, 2018, self-harm

On July 24, Williams was placed in a restraint chair because he had again cut his arm, this time with a metal object that he had previously concealed.[6] After Williams was

---

[6]  The record does not reveal whether any of the defendant officers were involved in securing

placed in the restraint chair, defendant Nurse Jorgensen examined his wound.  She noted that the wound was approximately 1.5 inches long, and less than 1 cm deep.  Jorgensen further noted that she cleaned the wound with normal saline and applied steri-strips. Jorgensen attests that she also conducted a "capillary refill" check on Williams to assess the blood flow to his hands and feet, ensuring that the restraint chair straps around his wrists and ankles were not too tight.  Although Williams claims that Nurse Jorgensen ignored the fact that the restraint on his left wrist was too tight, Jorgensen attests she observed that Williams had maintained adequate blood flow in his hands and feet. Williams also acknowledges that when he disagreed with Jorgensen over the tightness of the left wrist restraint, she pinched his fingertips on his left hand to see how quickly the color returned, and concluded that it seemed "fine."

Officer Haure then transported Williams to Cell 623A, during which Haure attests that he noticed Williams was able to turn his left hand.  In contrast, Williams claims that he was "barely able" to move his left hand, much less turn it, and that he could only open and close his left hand and move his fingers.  The video footage of the transport also shows that while Haure was placing Williams in Cell 623A, he was able to move his left hand back and forth slightly.  (Shellenberger Aff., Ex. 1, at 13:49-13:50.)

At that time, Officer Haure reports being aware that other inmates at the Dane County Jail had loosened wrist restraint belts by turning their hand in a similar manner as Williams.  Accordingly, Haure attests that before exiting Cell 623A, he tightened the left

---

Williams in the restraint chair, and the court has not granted Williams leave to proceed with respect to the decision to place him in the restraint chair, or any events that took place prior to his initial placement in the restraint chair.

wrist restraint belt, knowing that Williams (1) had a history of manipulation, concealing items and altering and using those items to harm himself or attempt suicide, (2) had recently attempted suicide, (3) was on suicide watch at that time, and (4) had indicated he would attempt suicide at the first opportunity.  However, Williams claims that just as Haure pulled the left wrist restraint tight, he whispered to Williams that this would "give him something to cry about."  (*See* dkt. #154, ¶ 6.)[7]

The video footage of this exchange shows Haure leaning forward and tightening the restraint on Williams' left wrist, and it is unclear from the footage whether Haure was whispering something.  However, *if* Haure said anything to Williams, he did not get close to him or linger near Williams' face.  As for the tightening itself, Haure took approximately one second to accomplish it, using only one hand.  (*See* Shellenberger Aff., Ex. 1, at 13:49-13:50.)  However, after Haure walked away, he attests that Williams began shouting profanity and spitting at him, as well as threatening him with physical harm.

The video footage does not contain audio, although Williams admits he used profanity in asking Haure to loosen the straps (calling him a "bitch").  Nevertheless, Williams denies threatening Haure with physical harm or spitting at him.  (Williams Decl.

---

[7] Understandably, defendants point out in reply that Williams did not submit an affidavit or declaration in support of this response to defendants' proposed findings of fact in particular. However, as previously noted, Williams subsequently submitted a declaration containing sworn statements related to his interactions with defendants.  (*See* dkt. #154.)  Since that information would be admissible at trial, the court has considered those statements for purposes of resolving defendants' motion for summary judgment.  *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'") (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).  Represented parties would normally not get the benefit of consideration of late-filed evidence, nor should even *pro se* litigants rely on similar relief in the future.

(dkt. #154) ¶ 11.)   Moreover, the video footage does not irrefutably show whether Williams spit at Haure, although the video does show that after Haure left, Williams quickly drew his head backwards and shot it forward, towards Haure.  (Shellenberger Aff., Ex. 1, at 13:55-13:56.)  Williams explains his head movements as cursing at Haure, not spitting, pointing out that the footage does not clearly capture spit flying through the air, but on this point the record obviously creates a disputed issue of fact.

However, the footage does show that Williams continued shouting after Haure exited the cell, then he aggressively rocked the restraint chair.  (*Id.* at 15:17-16:40.)  Indeed, Williams was able to rock the restraint chair across several feet of the cell over the course of about ten seconds.  (*Id.*)  The footage also shows that he *was* able to move his left hand back and forth at times.  (*Id.*)  According to Haure, it is common for inmates attempting to release their hands from restraint chair belts to rock in the restraint chair or pull on the belt.  After deputies asked Williams to stop rocking the restraint chair, he responded that he would not stop "doing shit" until they loosened the left wrist restraint.  Around that time, Haure attests that he observed "an unknown object fly out of Williams' mouth." (Haure Aff. (dkt. #97) ¶ 13.)  Of course, Williams disputes that anything flew out of his mouth, but does not submit evidence directly disputing Haure's observation.

The footage shows that about a minute after Haure left, he and defendants Bruning, Dolnick, Bock and Ansteth enter Cell 623A.  (Shellenberger Aff., Ex. 1, at 17:28.)  These defendants attest that their purpose in entering was to retrieve the unknown object and secure the restraint chair to the concrete bedside.  In the video, the first officer entered holding up a blanket and placed it over Williams' head; he was then followed by a female

officer and a male officer; and Office Haure was the fourth officer to enter the cell.

Once in the cell, the deputies replaced the blanket with a "spit hood" over Williams' head to prevent him from spitting. For about the next minute, the video appears to show that Williams continued to engage with the officers, but again the record does not reveal what he was actually saying. At the end of that minute, all of the officers re-approached Williams, apparently to secure the chair to the concrete bed, at which point Officer Haure was able to grab Williams' head with his hands and forearm. The footage then shows Williams' attempts to move his head away from Haure, and Williams concedes that he then called Haure a "bitch" and jerked his head away. Williams claims that Haure then struck him in the nose, causing his head to jerk back, while Haure disputes striking Williams. The video confirms that Haure placed his hands on Williams' forehead and face, and with his hand and forearm, held back Williams' face. (Shellenberger Aff., Ex. 1, at 18:45-18:50.) Haure then held Williams in that position for the next minute and a half. (*Id.* at 18:49-20:05.) During this period, Haure held Williams from behind, with both of Haure's elbows in view, and it appears that Haure never changed position, nor adjusted the amount of pressure or the hold he had on Williams. Nevertheless, Williams claims that Haure held his forearm between his jawline and neck, then forced his head to the left using his body weight. Williams further claims that defendant Ansteth was holding his head in place at that time.

Officer Haure attests that he secured Williams' head in this manner because it appeared Williams was trying to "get the spit hood over his mouth," and he wanted to prevent Williams from attempting to bite or headbutt the deputies that were focused on

securing the restraint chair.  (Haure Aff. (dkt. #97) ¶¶ 17, 18.)  Haure also believed that Williams presented a risk of harm to the deputies, knowing that Williams had a history of being dangerous to others at the jail *and* having already had him spit on Haure, aggressively rock the chair, refuse orders to stop rocking, and threaten him.  (*Id.* ¶ 19.)  While Williams does not dispute that Haure secured him for this period of time, he disputes being resistive, combative or unruly, and he attests that Haure did not need to use his bodyweight to hold his head in place.

Next, defendant Shellenberger was called to the area, but did not have direct contact with Williams.  Instead, he appears to have observed the deputies enter the cell.  Based on this, Williams claims Shellenberger failed to intervene and require the deputies to loosen the left wrist restraint or to stop defendants Haure and Ansteth from using excessive force against him.  In response, Bruning, Dolnick, Ansteth, Bock and Shellenberger all attest that they did not believe that Haure used excessive force on Williams.  More specifically, each attests that they did not observe Haure pull the left wrist restraint belt, nor Haure strike Williams.  They further attest that they did not know how tight the left wrist belt had been fastened, nor observe any swelling, discoloration or disfigurement of Williams' left hand.

Williams disputes this, claiming that these defendants had to know how tight the restraint was, because (1) he kept repeating that the belt was pinching his skin, and (2) they were all present when Haure struck him.  However, Williams not only fails to attest as much, he fails to explain how each of these individuals were able to see Haure tighten his left wrist from outside Cell 623A.  That said, these defendants do not dispute that

Williams *was* complaining about the left wrist restraint and asking for it to be loosened. Still, they each attest that inmates commonly ask to have their restraints loosened to break free of them. Since they had observed Williams rocking the chair aggressively, they did not believe that Williams' left wrist restraint was too tight.

Nurse Jorgensen further attests that she remained outside of Cell 623A when Williams was wheeled back to his cell, in the event additional medical care would be needed. While Jorgensen did not participate in placing the spit hood on Williams or restraining him, she never believed that Williams was having any trouble breathing, nor that he was experiencing a medical issue that required her intervention. As a nurse, Jorgensen further attests that she was not responsible for providing correctional services, such as securing or restraining inmates, and she believed the deputies' statements that Williams presented a risk of harm to correctional staff and himself, thus justifying the restraint.

After the restraint chair was secured, Officer Haure also located the unknown object and discovered that it was a "flattened metal piece from the head of a pencil eraser." (Haure Aff. (dkt. #97) ¶ 20.) Finally, when the deputies left the cell, the spit hood was removed, although Williams claims that Officer Haure did not check the tightness of his left wrist restraint despite his complaining about it, nor did Haure ask Nurse Jorgensen to check his left wrist.

## IV.   Subsequent medical attention and self-harm

Two hours later, Williams was removed from the restraint chair and assessed by a

11

nurse.[8]  Those records show Williams again complained about left hand pain, which he attributes to being placed in the smock and restraint chair.  (Reginato Aff., Ex. 1 (dkt.  at 13.)  Even so, the medical review at that time was "no gross anatomical defect visible, no bruising."  (*Id.* at 14.)  Williams also claims that he was prescribed acetaminophen for two days to treat his pain, despite reporting a pain level of 7 out of 10.  He further claims that his request to have photographs taken of his injuries was ignored.  Subsequently, Williams claims that he dealt with "some restrictions" in his range of motion, and that he reported on multiple occasions the injuries to his face.

The next day, July 25, 2018, Williams cut himself once again, with yet another piece of metal, after which he was back in a restraint chair.  When a nurse assessed him that day, Williams did not complain about or receive medical care for any injuries to his wrist, face or nose.  On July 26, while being examined, Williams showed a nurse a piece of metal that had been in his mouth, which the deputies had not retrieved.  At that time, however, Williams did not complain about injuries to his wrist, face or nose.  That day, Williams was transported to the University of Wisconsin Hospital ("UW Hospital") for additional treatment for his self-harm wounds, but there is also no record from the UW Hospital indicating that Williams complained about injuries to his wrist, face or nose.

OPINION

---

[8]  Williams did not seek leave to proceed on a claim challenging the length of time he was held in the restraint chair.  Moreover, in the court's review, that length of time appeared to be a measured response to his continuing attempts at self-harm.

12

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

## I.     Fourteenth Amendment Excessive Force

At screening, the court inferred that plaintiff was a pretrial detainee of the Dane County Jail on July 24, 2018, and the parties have not since suggested otherwise. Therefore, plaintiff's excessive force and failure to intervene claims fall under the Fourteenth Amendment's due process clause, and to prove his claim, plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable," based on the following factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the

threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[9]

As the Supreme Court explained in *Kingsley*, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Still, courts must consider "the perspective of a reasonable officer at the scene," and "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (U.S. 1989).

At no point in the video footage do Officer Haure's actions suggest that he was employing an unreasonable amount of force given the threat that plaintiff posed to himself and others. To the contrary, the only reasonable inference to be drawn from Haure's actions on the video is that he was making a concerted effort to ensure plaintiff would not be able to harm himself further, or to harm any staff or inmates.

---

[9]   Even if the Eighth Amendment's excessive force standard applies, it is considerably more deferential to defendant Haure. Indeed, to succeed on such a claim, plaintiff would need to prove that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'" *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). As such, any mistake with respect to plaintiff's status as of July 24, 2018, works to plaintiff's, not defendants', benefit.

The starting point in evaluating whether Haure's actions were objectively unreasonable is exactly what he knew when tasked with securing plaintiff in Cell 623A. Haure was aware that plaintiff had a history in the jail of concealing items used for self-harm, had recently tied a sheet around his neck, and was willing to harm himself when given the chance. When Haure tightened plaintiff's left wrist strap in particular, it is undisputed that Haure did so because just seconds before he had observed plaintiff moving his hand in a way suggesting that he was trying to free himself from the restraint or, at minimum, that it may be loose. Therefore, he tightened it. While the parties dispute just *how* much tighter Haure made the left wrist strap -- with plaintiff claiming it was painfully tight and Haure attesting that he simply pulled the strap to check that it was secure -- the video itself shows Haure bending over slightly as he leaves the cell and casually tugging with his right hand at the strap around plaintiff's left wrist without any discernable movement of the strap itself (or for that matter, Haure's hand). That entire action took just over a half-second at most. In fairness, plaintiff was definitively not happy afterward and appears to spit at Haure as he continues to leave the cell, but nothing about Haure's action appeared aggressive or calculated to cause harm.

Plaintiff nevertheless argues that Haure intended to hurt him, pointing to Haure's alleged statement at that moment: that he was going to give him "something to cry about." Although the court accepts for purpose of summary that Haure made that statement, in viewing the video footage, no reasonable fact-finder could find whatever Haure's stated intent, he *actually* used an unreasonable amount of force in tightening the strap. Indeed, Haure's body language, casual motion and lack of any discernable force or movement of

15

the strap, make it appear to be an afterthought on Haure's behalf, and certainly preclude a jury's acceptance of plaintiff's version of events, however much his rocking back and forth in the restraint chair for approximately three and a half minutes before defendants retuned to secure the chair to the wall might suggest discomfort.

"When opposing parties tell two different stories, one of which is blatantly contradicted by [the video and audio evidence] so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 381 (2007). Given the danger plaintiff was posing to himself at that point, Haure's belief that plaintiff was attempting to loosen the strap and harm himself, and the easy manner in which Haure touched the strap, it would be unreasonable to infer that Haure's action was disproportionate to the need to ensure that plaintiff's left wrist was secure in the restraint chair.

The result is the same with respect to the way Haure held plaintiff's head when plaintiff was being secured to the concrete bed. The video footage shows that after plaintiff has contorted and rocked the restraint chair back forth across the cell floor for over three minutes, a group of officers returned, and for approximately one and a half minutes after a spit mask was placed on plaintiff's face, Haure held plaintiff's head back while Bruning, Dolnick, Ansteth, and Bock were securing the restraint chair to the concrete bed. Plaintiff claims that Haure struck him, but again that assertion is contradicted by the video footage: at no point during that period does the video even suggest that Haure struck, kicked or punched plaintiff; rather, the video shows Haure grabbing plaintiff's head and pushing it to the side to keep him in place while other officers were reaching around and behind to

16

secure the chair.

Still, plaintiff claims that he was compliant while Haure was holding him back. Even assuming plaintiff was completely still and calm, however, no reasonable jury could fault Haure's decision to secure his head with the fumbling going on around him. Moreover, to determine the reasonableness of Haure's decision to restrain plaintiff, the court must incorporate all of the facts known to him at the time the restraint chair was being secured to a concrete bed. *See Burton*, 901 F.3d at 780 (emphasizing that the question of reasonableness depends on "the facts and circumstances before them and known to them at the time" of the incident). In addition to knowing plaintiff's general history of self-harm and dangerousness within the jail, it is *undisputed* that at that time Haure restrained plaintiff's head from moving he (1) had just committed self-harm, (2) was swearing and yelling at Haure and other staff, (3) had been aggressively rocking the restraint chair, (4) refused orders that he stop rocking in the chair, and (5) had been moving his hands in a manner suggesting that he was trying to break free of the restraints. Haure also believed that plaintiff had spit at him, something the video appears to confirm, and he thought plaintiff had been trying to move the spit mask to do so again. Plaintiff says he did not spit at Haure, but the video footage at least makes Haure's belief to the contrary reasonable. Given these circumstances, even assuming that plaintiff was not resisting at the time his chair was being secured, it was reasonable for Haure to arrest plaintiff's head movements to discourage further disruptive behavior. As such, no finder of fact could conclude that Haure's decision to maintain control over plaintiff's head was objectively unreasonable.

Finally, plaintiff argues that defendants did not follow jail policies on the handling of prisoners in restraints. Specifically, he cites multiple Dane County Jail policies related to the monitoring and treatment of prisoners being held in restraints,[10] and those governing officer use of force.[11] However, the violation of a jail or prison policy does *not* establish a constitutional violation. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (violation of department procedure or state law is immaterial to whether actions violated federal constitutional rights). Regardless, under the circumstances just outlined, no reasonable jury could find Haure liable. *See Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) ("Excessive-force claims are governed by the Fourth Amendment's 'reasonableness' standard, which turns on the totality of the circumstances confronting [the officers] viewed from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and allowing for the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" (quoting *Graham*, 490 U.S. at 396–97)).[12]

---

[10] Section 604.01(F) of the Dane County Sheriff's Office Security Services Manual provides that there shall be continued audio monitoring of prisoners in restraints. Section 604.01(1)(B) requires restraints to be affixed in a manner designed to minimize discomfort or injury, and that restraints should be administered to restrict movement only to the degree necessary.

[11] Section 200.520(1)(c) requires deputies to use only the amount of force appropriate and to prevent misuse of force by others. Section 200.520(1)(F) provides that once a prisoner has stopped resisting, attempting to escape or is otherwise under control, the amount of force used must be reduced to the appropriate level necessary to maintain control of the subject.

[12] The court notes that defendant Haure argues that plaintiff's injuries were minimal, and thus, would not support a constitutional claim. Defendants cite cases from the Western District of Pennsylvania, *Knight v. Walton*, 2015 WL 9243902, at *5 (W.D. Penn. Sept. 24, 2015) (no constitutional violation where restraint belt was too tight because "pain and swelling in [right] wrist" that lasted 16 days constitutes de minimus injuries); *Gilliam v. Pearce*, 2017 WL 5015994,

In securing plaintiff's restraints, Officer Haure faced the challenging task of securing an inmate who was both physically and verbally disruptive, and who at the time posed not only a danger to himself but also to others within the jail. Although plaintiff continues to insist that Haure used more force than was necessary to restrain him, he fails to acknowledge or account for the fact that he had a well-documented history of disruptive and dangerous behavior in the jail, and that his behavior on July 24, 2018, had unfortunately amounted to more of the same. With that context front of mind, the evidence of record depicting Haure's slightly tightening the left strap, if at all, and securing of plaintiff's head while other officers worked to secure him, simply does not support a finding that Haure went too far or employed too much force in maintaining control over the plaintiff. Accordingly, defendant Haure is entitled to summary judgment on the merits of plaintiff's excessive force claim against him.

## II.   Failure to intervene

The remaining defendants are entitled to summary judgment as well, and for much the same reason. To be held liable for a failure to intervene, the plaintiff must prove that the defendant "(1) knew that a constitutional violation was committed; and (2) had a

---

at *7 (W.D. Penn. Sept. 26, 2017) (similar holding where inmate "suffered only superficial injuries from the straps that completely resolved after a week"). However, the Seventh Circuit has rejected this argument in the context of Eighth Amendment excessive force claims, finding that there is no *de minimus* force requirement because the Eighth Amendment does not include a "significant injury requirement." *Washington v. Hively*, 695 F.3d 641, 642 (7th Cir. 2012); *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) ("When a physical injury occurs as the result of force applied in the course of prison operations, as happened to Guitron, the courts should approach the matter as *Whitley [v. Albers*, 475 U.S. 312 (1986)], and *Hudson v. McMillian*[, 503 U.S. 1 (1992),] direct, rather than trying to classify injuries as *de minimus*."). As such, Haure is not entitled to judgment in his favor on this ground *despite* a dearth of evidence suggesting severe injury.

19

realistic opportunity to prevent it," but (3) failed to do so.  *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).[13]  The County Defendants in particular seek summary judgment with respect to the failure-to-intervene claims against defendants Bruning, Dolnick, Ansteth, Bock and Shellenberger because:  (1) they did not actually witness Haure tighten plaintiff's left wrist strap; and (2) Haure did not use excessive force, so they cannot be held liable for failing to intervene to stop him.  Defendant Jorgensen seeks judgment on the same grounds, adding that in her role as a nurse, she lacked the knowledge or authority to intervene to stop Haure, *and* she did not believe that plaintiff was suffering from a serious medical need that required attention.

In opposition, plaintiff first insists that Bruning, Dolnick, Ansteth,[14] Bock, Shellenberger and Jorgensen each witnessed Haure tighten the wrist strap, and further that Nurse Jorgensen witnessed the officers securing the restraint chair to the concrete bed.  As noted above, however, plaintiff has not formally attested that each of them witnessed Haure tighten the strap, and even if he had, those defendants would have seen no more than what was on the video tape.  Thus, they are *still* entitled to judgment in their favor.

---

[13] Defendants also sought summary judgment on the basis of qualified immunity.  Because the court finds that no reasonable jury could find the defendants' use of force was objectively unreasonable, the court need not address this issue.

[14] Defendants point out that plaintiff argues in his opposition brief (dkt. #114, ¶ 19) that defendant Ansteth "used more force than necessary given the situation and circumstances of the situation," apparently referring to Ansteth's involvement in securing plaintiff to the concrete bed.  However, defendants correctly point out that the plaintiff did not seek leave to proceed against Ansteth on an excessive force claim, nor did the court grant plaintiff leave to do so.  *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend [his] complaint through arguments in [his] brief in opposition to a motion for summary judgment.") (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)).  As such, the court examines the evidence of record against Ansteth only under the framework of a failure-to-protect claim.

To start, given the court's finding that no reasonable fact-finder could conclude that Haure used excessive force against plaintiff -- either in briefly checking the left wrist strap or in holding plaintiff's head back while his chair was being secured -- none of these defendants can be faulted for not intervening to either loosen the strap or prevent Haure from holding plaintiff's head. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.").

Although the court need not go further, for the sake of argument, even assuming that Officer Haure's use of force was, in fact, unreasonable, there is also no evidence of record suggesting that any of these defendants were aware Haure was using unreasonable force, had the opportunity to intervene, or failed to do so. Again, as with Haure, context matters. Here, these additional defendants were aware that plaintiff had: (1) previously committed self-harm using hidden objects, which was why he was placed in a restraint chair in the first place; and (2) had been well known within the jail for self-harming, manipulating staff, and posing a danger to others. Thus, assuming that each of these defendants witnessed Haure tighten plaintiff's left wrist strap in the apparently innocuous manner reflected in the video, or restrained his head as also shown, nothing in the record indicates that they had reason to believe that he was using more force than necessary to restrain the plaintiff.

In fairness, plaintiff might point to his subsequent shouting and complaints about his strap, which took place for the three minutes between Officer Haure securing him and their return to Cell 623A to attach the restraint chair to the concrete bed. While the video

footage confirms that plaintiff was shouting during that period of time, defendants Bruning, Dolnick, Ansteth, Bock and Shellenberger each credibly attest that inmate complaints about the tightness of restrains are common among inmates, some of whom do so to manipulate staff into releasing them from the restraints.  Given plaintiff's continued disruptive behavior (he was moving the restraint chair across the room and rocking back and forth for most of the three minutes), and these defendants' knowledge of plaintiff's previous manipulation of staff and self-harm within the jail, their failure to question how tight Haure had made the straps or to loosen the straps themselves, amounts to no more than simple prudence, *not* evidence of a failure to prevent a constitutional violation.

In addition, plaintiff has not come forward with evidence suggesting that these defendants had any other reason to believe that plaintiff was in physical discomfort. Indeed, the video footage of plaintiff struggling in the restraint chair readily suggests anger and frustration, not physical distress.  More importantly, even assuming that plaintiff *was* experiencing pain in his wrist, there is no question that his behavior remained extremely disruptive and dangerous throughout this period of time.  So much so, that it was necessary to restrain plaintiff further by attaching the chair to the concrete bed -- a compliance measure that required the involvement of *five* officers to execute, including Haure.  As such, no reasonable observer could have known that Haure had used an unreasonable degree of force in restraining plaintiff's left wrist *or* in holding back his head.

The result is certainly the same for Nurse Jorgensen, who plaintiff claims failed to recognize that the left wrist strap was too tight even *before* Haure allegedly yanked it, and then witnessed the officers' using excessive force while plaintiff was being secured in the

restraint chair to the concrete slap.  Starting with the question about the wrist strap, Nurse Jorgenson attests that her capillary check did not reveal any issues.  Further, Jorgensen attests that she did not observe anything problematic about the way Haure strapped plaintiff into the chair.  While plaintiff disagreed with Jorgensen's assessment about his level of pain, claiming that he informed her that the strap was too tight, it is undisputed that Jorgensen's capillary check did not reveal any medical issues that required her to loosen the straps.  Moreover, as a nurse, she is entitled to some deference when exercising medical judgment, even though plaintiff disagrees.  *See Zaya v. Sood*, 836 F.3d 800 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").  As importantly, while Jorgensen admits that she and plaintiff disagreed about the tightness of his restraints, she also confirmed her view at the time was that:  plaintiff posed a risk of harm to himself, her and Haure; it was necessary to restrain him; and she did not observe plaintiff experiencing medical issues.  Placing her line of reasoning into the context of the video footage, as well as plaintiff's undisputed history of self-harm and manipulation of staff, Nurse Jorgensen's decision not to loosen plaintiff's straps based on his complaint alone is not enough for any reasonable fact-finder to infer a constitutional violation.

Plaintiff would similarly fault Jorgensen for witnessing Haure tightening plaintiff's left wrist strap, then failing to take corrective action.  However, as Jorgensen points out, plaintiff alleged in his amended complaint that Haure did *not* tell the nurse that he tightened the strap after she performed the check (*see* Am. Compl. (dkt. #45) ¶ 15),

meaning that Jorgensen had *not* witnessed Haure tightening the strap.  While plaintiff would now alter the facts by attesting that Jorgensen was "standing outside the cell door," saw what Haure did, and heard plaintiff yelling (Williams Decl. (dkt. #154) ¶ 17), his two statements appear to be *directly* contradictory.  Regardless, Jorgensen's failure to intervene and loosen the strap was not unreasonable for the same reasons explained above.

Finally, as to Jorgensen's presence at Cell 623A when the officers were securing him to the bed, it is undisputed that she was there in her capacity as a nurse and was in no position to make judgment calls with respect to security-related decisions; rather, her role was to assist in any medical care issues that may arise.  Again, in that capacity, Jorgensen had no reason to believe that the officers' securing him employed more force than necessary, particularly given the demonstrated risk that plaintiff would become disruptive and pose a risk to her and other staff.

Accordingly, defendants Bruning, Dolnick, Ansteth, Bock, Shellenberger, and Jorgensen are also entitled to summary judgment.

ORDER

IT IS ORDERED that:

1) The County Defendants' and defendant Kaitlyn Jorgensen's motions for summary judgment (dkt. ##89, 126) are GRANTED.

2) Plaintiff Quentrell Williams' motion for ruling (dkt. #199) is DENIED as moot.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 30th day of April, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge